STATE of Wisconsin, Plaintiff-Respondent,

v.

Anthony R. OWENS, Defendant-Appellant.†

Court of Appeals

*No. 2015AP1118–CR. Submitted on briefs February 2, 2016.—Decided March 1, 2016.*

2016 WI App 32

(Also reported in 878 N.W.2d 736.)

† Petition for review filed.

265

On behalf of the defendant-appellant, the cause was submitted on the brief of *Esther Cohen Lee* of *Hall, Burce and Olson, S.C.* of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Brad D. Schimel*, attorney general, and *Nancy A. Noet*, assistant attorney general.

Before Curley, P.J., Kessler and Brash, JJ.

¶ 1. BRASH, J. Anthony R. Owens appeals a judgment convicting him of first-degree reckless homicide as a party to a crime with the use of a dangerous weapon as a repeater, and possession of a firearm by a felon as a repeater. He also appeals an order denying his postconviction motion. Owens makes the following arguments on appeal: (1) the circuit court erred when it admitted Jamal Pinkard's statements about who shot him as dying declarations; (2) the evidence against Owens was insufficient to support his convictions; and (3) Owens's sentences were unduly harsh. We disagree and affirm.

### BACKGROUND

¶ 2. On August 19, 2013, City of Milwaukee Police Officer Derek Kitts responded to a report of a shooting in the vicinity of 2206 West Burnham Street. Upon arrival, Kitts found Pinkard lying on the ground suffering from a gunshot wound to his chest. Pinkard's condition was dire; he was pale, gasping for air, and was going in and out of consciousness. Two individuals

were treating Pinkard when Kitts arrived. Kitts took over first aid from these two individuals so officers could interview them.

¶ 3. While performing first aid, Kitts attempted to gain as much information as possible from Pinkard. Kitts asked Pinkard who shot him. Pinkard attempted to answer, but Kitts was unable to hear what Pinkard was saying. Kitts again asked Pinkard who shot him. Kitts leaned in close to Pinkard and was able to hear Pinkard say "Anthony." Kitts asked Pinkard if he knew Anthony's last name. Pinkard responded that he did not know Anthony's last name, but when asked by Kitts if Anthony went by any other name, Pinkard responded "Lil Ant" and "2–1." Based on Pinkard's statements, officers were able to narrow the suspects down to two people, one of whom was Owens.

¶ 4. Throughout Kitts's exchange with Pinkard, Pinkard was gasping for air and having difficulty breathing, and at times appeared to be losing consciousness. To keep Pinkard's attention, Kitts shook Pinkard's shoulders and at one point yelled at him "don't die on me" and "open your eyes." Shortly thereafter, the fire department arrived on the scene and took over first aid. Pinkard died in the ambulance on the way to the hospital.

¶ 5. On August 28, 2013, Owens was charged with possession of a firearm by a felon as a repeater, contrary to Wis. Stat. §§ 941.29(2),[1] 939.50(3)(g), and 939.62(1)(b) (2013–2014).[2] Ultimately, the State added the charge of first-degree reckless homicide as a party

---

[1] Wisconsin Stat. § 941.29(2) was repealed by 2015 Wis. Act 109. Owens, however, was charged and convicted under § 941.29(2) prior to its repeal.

[2] All references to the Wisconsin Statutes are to the 2013–14 version unless otherwise noted.

to a crime with the use of a dangerous weapon as a repeater, contrary to Wis. Stat. §§ 940.02(1), 939.50(3)(b), 939.05, 939.63(1)(b), and 939.62(1)(c). On March 5, 2014, the State filed an amended information listing first-degree reckless homicide as a party to a crime with the use of a dangerous weapon as a repeater as count one, and possession of a firearm by a felon as a repeater as count two.

¶ 6. On January 24, 2014, the State filed a motion to admit the statements of Pinkard identifying Owens as his shooter under Wis. Stat. § 908.045(3), the dying declaration exception to the hearsay rule. A motion hearing was held on March 5, 2014. At the motion hearing, Kitts testified as to the circumstances under which he questioned Pinkard on August 19, 2013. Following arguments by both parties, the circuit court ruled that the statements made by Pinkard relating to the identification of who shot him were admissible under § 908.045(3).

¶ 7. A jury trial commenced on August 11, 2014, and concluded on August 13, 2014, after which the jury found Owens guilty on both counts. The circuit court ordered a presentence investigation report to be prepared prior to sentencing. On October 10, 2014, the circuit court sentenced Owens to forty-five years for count one, with thirty-five years of initial confinement and ten years of extended supervision. For count two, the circuit court sentenced Owens to eight years, with four years of initial confinement and four years of extended supervision to run consecutive to count one.

¶ 8. On May 15, 2015, Owens filed a postconviction motion seeking to vacate his convictions or, in the alternative, vacate his sentences and be resentenced.

On May 22, 2015, the circuit court denied Owens's postconviction motion without a hearing. This appeal follows.

DISCUSSION

¶ 9. On appeal, Owens makes the following arguments: (1) the circuit court erred when it admitted Pinkard's statements about who shot him as dying declarations; (2) the evidence against Owens was insufficient to support his convictions; and (3) Owens's sentences were unduly harsh. We discuss each in turn.

## I. Dying Declarations

¶ 10. WISCONSIN STAT. § 908.02 states that "[h]earsay is not admissible [at trial] except as provided by these rules or by other rules adopted by the supreme court or by statute." Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." WIS. STAT. § 908.01(3). One exception to the rule against hearsay, however, is the dying declaration. *See* WIS. STAT. § 908.045(3). A dying declaration is "[a] statement made by a declarant while believing that the declarant's death was imminent, concerning the cause or circumstances of what the declarant believed to be the declarant's impending death." *Id.*

¶ 11. For a statement to be admissible as a dying declaration, the declarant need not specifically say their death is imminent. *See State v. Beauchamp*, 2010 WI App 42, ¶ 8, 324 Wis. 2d 162, 781 N.W.2d 254. "Belief of impending death 'may be made to appear

273

from . . . the nature and extent of the wounds inflicted being obviously such that he must have felt or known that he could not survive.' " *Id* . (citing *Mattox v. United States*, 146 U.S. 140, 151 (1892)). Whether a statement is admissible as a dying declaration falls within the circuit court's discretion. *Beauchamp*, 324 Wis. 2d 162, ¶ 7. We will uphold an evidentiary ruling as long as the circuit court examined the relevant facts, applied a proper legal standard, and used a rational process to reach a conclusion that a reasonable judge could reach. *See id*.

■

¶ 12. In light of the circumstances surrounding Pinkard's statements to Kitts on August 19, 2013, we conclude that the circuit court did not erroneously exercise its discretion in ruling that Pinkard's statements relating to who shot him were admissible under WIS. STAT. § 908.045(3). Kitts found Pinkard lying on the ground and suffering from a gunshot wound to his chest. Pinkard was pale, gasping for air, and going in and out of consciousness. At one point, Kitts had to yell at Pinkard "don't die on me" and "open your eyes." Furthermore, Pinkard died in the ambulance on the way to the hospital.

¶ 13. Owens argues that there is no evidence to suggest that Pinkard believed that he was actually in danger of dying. We disagree. We find nothing in the record to suggest that Pinkard did not understand that his injuries were life threatening. Being shot in the chest would cause any rational adult to fear imminent death. The nature of Pinkard's injury itself supports the inference that Pinkard believed he was going to die. This inference is strengthened by the fact that Pinkard was gasping for air, going in and out of consciousness, and that he died while he was en route

to the hospital. Although Pinkard did not specifically comment on whether he thought he was going to die, he did not have to. *See Beauchamp*, 324 Wis. 2d 162, ¶ 8. Under the circumstances, it was proper for the circuit court to infer that Pinkard believed he was in danger of dying. *See id.* Indeed, Kitts reinforced Pinkard's suspicions when he yelled at Pinkard not to die. Accordingly, we conclude that the circuit court did not erroneously exercise its discretion when it admitted Pinkard's statements identifying Owens as his shooter as dying declarations under Wis. Stat. § 908.045(3).

¶ 14. Owens also argues that by admitting Pinkard's statements as dying declarations, the circuit court denied Owens his constitutional right to confrontation. We disagree.

¶ 15. ' "The Confrontation Clause of the United States and Wisconsin Constitutions guarantee criminal defendants the right to confront witnesses against them.' " *Beauchamp*, 324 Wis. 2d 162, ¶ 10 (citation omitted); *see also* U.S. Const. amend. VI; Wis. Const. art. I, § 7. "The confrontation right applies to statements that are 'testimonial.' " *Beauchamp*, 324 Wis. 2d 162, ¶ 10 (citation omitted). In the present case, there is no dispute that Pinkard's dying declarations are testimonial. Not all testimonial out-of-court statements, however, are barred by the right to confrontation. *Id.*, ¶ 11. Dying declarations are admissible even though they are not confronted. *See id.*; *see also Giles v. California*, 554 U.S. 353, 357 (2008). Accordingly, we conclude that receipt into evidence of Pinkard's dying declarations did not violate Owens's right to confrontation.

## II. Sufficiency of the Evidence

¶ 16. Owens argues that there was insufficient credible evidence adduced at trial to establish his guilt beyond a reasonable doubt. We disagree.

¶ 17. The credibility of witnesses and the weight of the evidence are matters for the jury. *State v. Poellinger*, 153 Wis. 2d 493, 504, 451 N.W.2d 752 (1990). It is also the function of the jury to resolve any conflicts in witnesses' testimony. *See id.* at 506. We will not reverse a conviction for lack of sufficient evidence "unless the evidence, viewed most favorably to the [S]tate and the conviction, is so insufficient in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." *See id.* at 501.

¶ 18. We conclude that the evidence presented at trial in the present case is of sufficient probative value that a reasonable jury could find Owens guilty beyond a reasonable doubt. First, shortly before he died from a gunshot wound to the chest, Pinkard identified Owens as the man who shot him. Kitts testified at trial as to Pinkard's dying declaration. This evidence on its own is particularly damning to Owens. Other testimony presented at trial corroborates Pinkard's dying declaration. Focusing on conflicts between other witnesses' trial testimony and statements they made prior to trial, Owens argues that there is insufficient credible evidence to find him guilty beyond a reasonable doubt. We are not persuaded.

¶ 19. Juiquin Pinkard, Pinkard's cousin, testified at trial that he saw Owens holding and firing a gun at

Pinkard on August 19, 2013. Juiquin provided a detailed account of how the shooting occurred, never wavering in his identification of Owens as the shooter. Although Juiquin's trial testimony conflicted with statements he made prior to trial—namely, when he learned that Pinkard also had a gun, how many people he saw with Owens immediately before the shooting, and whether he saw Pinkard fall down after being shot—these conflicts were addressed at trial. It was up to the jury to resolve these conflicts and assess Juiquin's credibility. *See id.* at 503, 506.

¶ 20. James Warfield, also Pinkard's cousin, testified at trial that he saw some of the shooting incident after first hearing gunfire while inside his father's house. Warfield also testified that he heard someone yell, "This is Ant doing this to you all." A detective who interviewed Warfield just after the shooting testified that while Warfield told him he heard both gunfire and an individual yell, "This is Ant doing this to you all," Warfield did not tell the detective that he witnessed any part of the gunfire. As with Juiquin's testimony, however, it was the jury's duty to resolve this conflict. *See id.*

¶ 21. Edgar Maisonet initially told the police that leading up to the shooting, he attempted to mediate a dispute between Owens and Pinkard. Maisonet also told police that he called Owens at Pinkard's request to arrange for Owens to come to the area. At trial, however, Maisonet denied making those statements. In response, the State called Detective Patrick Pajot, the officer Maisonet spoke with after the shooting, to impeach Maisonet. Once again, the credibility of Maisonet's testimony, and how much weight it should receive was a question for the jury. *See id.*

¶ 22. Finally, Owens argues that Christina Deberry's trial testimony did not implicate him in Pinkard's shooting. Deberry testified that Juiquin called her while she was at her mother's house saying that he and Owens had words over the phone. Deberry testified that she drove over to the area of 2206 West Burnham Street. Deberry testified that while she was there she heard Maisonet receive a phone call, but she did not know who it was from or what was said. Finally, Deberry testified that she left the area on foot and as she was walking home she heard gunshots, but did not look back to see what happened. While we agree that this testimony does not directly implicate Owens, it does not change the fact that the testimony of several other witnesses does.

¶ 23. The evidence against Owens, when viewed in the light most favorable to the State and the convictions, supports the jury's findings of guilt beyond a reasonable doubt. *See id.* at 501. To the extent that there were conflicts between some of the witnesses' testimony and their prior statements, there is nothing in the record to suggest that the jury was not made fully aware of those conflicts and given the opportunity to resolve them. *See id.* at 506. We conclude, therefore, that there was sufficient evidence to convict Owens on both counts one and two.

### III. Owens's Sentences

¶ 24. Finally, Owens argues that his sentences were unduly harsh and severe and constituted an erroneous exercise of the circuit court's sentencing discretion. We disagree.

278

¶ 25. Sentencing falls within the discretion of the circuit court. *McCleary v. State*, 49 Wis. 2d 263, 275, 182 N.W.2d 512 (1971); *State v. Gallion*, 2004 WI 42, ¶ 17, 270 Wis. 2d 535, 678 N.W.2d 197. When imposing a sentence, the circuit court must identify the objectives of its sentence, which include protecting the community, punishing the defendant, rehabilitating the defendant, and deterring others. *Gallion*, 270 Wis. 2d 535, ¶ 40. In determining the sentencing objectives, the circuit court must consider a variety of factors, including the gravity of the offense, the character of the defendant, and the need to protect the public. *State v. Harris*, 2010 WI 79, ¶ 28, 326 Wis. 2d 685, 786 N.W.2d 409; WIS. STAT. § 973.017. The weight assigned to each factor is left to the circuit court's discretion. *Id.* Moreover, the amount of explanation required for each sentence varies from case to case. *Gallion*, 270 Wis. 2d 535, ¶ 39. If a sentencing court considered "the proper factors, explained its rationale for the overall sentence it imposes, and the sentence is not unreasonable, the court does not erroneously exercise its discretion simply by failing to separately explain its rationale for each and every facet of the sentence imposed." *State v. Matke*, 2005 WI App 4, ¶ 19, 278 Wis. 2d 403, 692 N.W.2d 265.

¶ 26. A sentence is unduly harsh "only where the sentence is so excessive and unusual and so disproportionate to the offense committed as to shock public sentiment and violate the judgment of reasonable people concerning what is right and proper under the circumstances." *Ocanas v. State*, 70 Wis. 2d 179, 185, 233 N.W.2d 457 (1975). We review claims for unduly harsh sentences under the erroneous exercise of dis-

cretion standard. *See State v. Stenzel*, 2004 WI App 181, ¶ 7, 276 Wis. 2d 224, 688 N.W.2d 20. If, after reviewing the sentencing record, we determine that the circuit court considered the proper factors and articulated the objectives of the sentence imposed, we will not overturn the sentence. *See Gallion*, 270 Wis. 2d 535, ¶ 4.

■

¶ 27. At sentencing, the State recommended a total sentence of forty-two years of initial confinement and fourteen years of extended supervision. The defense recommended a total sentence of twenty-five years of initial confinement and left the amount of extended supervision up to the court. The presentence investigation report writer recommended a total sentence between twenty-nine and forty years of initial confinement and between ten and fourteen years of extended supervision. All parties were arguing for consecutive sentences. Because of Owens's "callous attitude towards human life," the circuit court sentenced him to a total of thirty-nine years of initial confinement and fourteen years of extended supervision.

¶ 28. When the circuit court sentenced Owens, it noted that homicide was a severe offense and that Owens's prior correctional experience had not changed his criminal behavior. The circuit court considered Owens's criminal record as well as his vocation and employment. The circuit court went on to explain that because Owens had killed someone, punishment was appropriate. The circuit court stated that it wanted Owens's sentences to both serve as a specific deterrence to him and as a general deterrence to others. The circuit court further stated that because of the nature

280

of the crime, the public needed to be protected. To that end, the circuit court explained that long-term confinement was appropriate.

¶ 29. Owens argues that his sentences are unduly harsh because the circuit court failed to specifically discuss why the sentences imposed were required to rehabilitate him. While the circuit court stated that rehabilitation is a factor it considered, it did not elaborate on how the sentences imposed related to that factor. As discussed above, however, the circuit court is not required to "separately explain its rationale for each every facet of the sentence imposed." *See Matke*, 278 Wis. 2d 403, ¶ 19. Instead, the circuit court believed the overriding sentence factors in this case were the severity of the offense and the related needs to punish Owens and protect the community. Giving more weight to these factors was well within the court's discretion. *See Harris*, 326 Wis. 2d 685, ¶ 28.

¶ 30. After our review of the record, we conclude that Owens's sentences were not so excessive and unusual as to shock public sentiment. *See Ocanas*, 70 Wis. 2d at 185. Accordingly, we further conclude that the circuit court did not erroneously exercise its discretion when sentencing Owens.

¶ 31. For the foregoing reasons, we affirm.

*By the Court.*—Judgment and order affirmed.