806 S.E.2d 724

**The STATE, Appellant,**

v.

**Marvin Reginald BROWN, Respondent.**

**Appellate Case No. 2014-002129**
**Opinion No. 5506**

Court of Appeals of South Carolina.

Heard April 18, 2017
Filed August 2, 2017
Rehearing Denied December 5, 2017

338

Attorney General Alan McCrory Wilson and Deputy Attorney General Donald J. Zelenka, both of Columbia; and Solicitor Scarlett Anne Wilson, of Charleston, for Appellant.

Appellate Defender Susan Barber Hackett, of Columbia, for Respondent.

KONDUROS, J.:

In this criminal case, the State appeals the circuit court's decision finding the statement of the victim inadmissible as a dying declaration exception to hearsay. The State argues the circuit court erred in (1) finding the statement inadmissible as hearsay, (2) making conclusions regarding the medical records, and (3) finding the victim was planning to seek revenge. We affirm.

**FACTS**

Davon Goodwin, a nineteen-year-old man, sustained a gunshot wound to his abdomen on April 26, 2011. Emergency medical services transported Goodwin to the hospital, and the medical records indicate he arrived at the hospital "alert" and "spitting up or coughing up bright red blood" with a severe

abdominal wound requiring immediate surgery. Goodwin was intubated and doctors performed emergency surgery to repair his abdominal wounds. Doctors performed another surgery the next day, April 27, which included the placement of drains and tubes. The medical records indicate Goodwin was extubated on the morning of April 28.

On April 29, Detective Jerome Fleming with the City of Charleston Police Department, went to the hospital to interview Goodwin in the intensive care unit. Goodwin identified Marvin Reginald Brown from a six-pack photographic line-up as the person who shot him. On the same day Goodwin made the identification to Detective Fleming, Goodwin was moved out of the intensive care unit "to the floor." Medical records reveal "the decision was made that he was ready for transfer to the floor;" "[h]e is up and out of bed-to-chair and [physical therapy] has been consulted to work with ambulation;" "[h]is abdominal incision is closed and the skin is closed with staples and is clean, dry, and intact;" and "[h]e has been tolerating tube feeds through [the tube] without any difficulty."

The medical records also indicate Goodwin continued to have pain and was not interested in physical therapy. For example, the "[Physical] Therapy Charting Report" of April 30—the day after Goodwin gave the identifying statement to Fleming—indicates his "[a]verage pain over the last 24 hours" was "8/10," his goal was "not [to] do [physical therapy]," and his response to the treatment was noted as "fatigued" with impairments of "decreased endurance, pain, limited mobility." On the other hand, the same physical therapy record that day states: "Patient is alert and oriented to name, place[,] and date;" he "[t]olerates 5 to 15 minutes of an uninterrupted exercise bout;" his physical therapy prognosis is "good;" and the long term outcome "as discussed with patient and/or family" includes a notation that Goodwin "will be able to return to work/school full time" and "will be independent with all self care including driving."

While still in the hospital, on the morning of May 4, Goodwin was found to be unresponsive. Efforts to revive Goodwin failed, and he was pronounced dead. The medical records include notations that a pulmonary embolism was the suspected cause of Goodwin's death and his death was a

"[s]udden, unexpected, unexplained death." However, the Forensic Autopsy Final Report established the cause of death as "[c]omplications of a single penetrating gunshot wound to abdomen." Brown was indicted for murder, armed robbery, and possession of a firearm during the commission of a violent crime. Before trial, Brown moved to exclude Goodwin's identifying statement to Detective Fleming as hearsay and a violation of the Confrontation Clause.

At the suppression hearing, Detective Fleming described Goodwin as "very weak" and "unable to really raise his hands or arms ... and speak loudly." Detective Fleming answered affirmatively when asked whether Goodwin "was able to communicate," "was lucid and alert," and "was able to correct you if you misheard something he said." Detective Fleming also testified he had to encourage Goodwin to identify the person who shot him, explaining "[i]t is common knowledge, as far as a lot of victims ... they don't want to be identified as being an individual that assisted police." Detective Fleming noted:

> My comments to him [were] that he's the victim here of this shooting, and very fortunate at that time to say that—to be alive. And ... there was no one out there really to come forward to say that they witnessed this shooting, and he was the only guy that could say—we could say establish who the perpetrator of the crime was and bring him to justice.

Goodwin's family members also testified at the hearing. Goodwin's grandfather testified Goodwin told him he would not be able to ride with him in the car, an activity they had enjoyed together: "I was sitting there holding his hand, and we were talking about the times we had, and the subject came up about us riding around.... And he said he wouldn't be able to ride with me, and that my other grandson ... would have his seat." Goodwin's grandfather also testified Goodwin told him "he wasn't going to make it." However, Goodwin's grandfather could not remember with specificity at what point during Goodwin's hospitalization these conversations occurred. Of Goodwin's demeanor after surgery, Goodwin's father testified Goodwin was

> [a]lmost like a—a child just happy to see his parents, because ... he know[s] I'm dad, I'm going take care of him, you know. You know, more like, for example, like if your child got in a fight at school or beat up with a gang and be

happy to see their parents when they see them, because they [are] scared.

Goodwin's father also testified his son "was in a deep stare, and always want[ed] you to hold his hand."

Goodwin's sister testified Goodwin cried while in the hospital, although she had never seen him cry before, and Goodwin "seemed tired, and he was ready to go home."[1] Goodwin's brother testified Goodwin told him "everything will be all right," and "the boy shot him." Regarding the person who shot Goodwin, Goodwin's brother said: "I know who he is."

At a subsequent hearing, the circuit court verbally ruled Goodwin's statement was not a statement made under the belief of impending death, noting Goodwin had been extubated at the time of the statement; his sister testified "he just seemed tired and ready to go home;" and Goodwin was "ambulatory," "screened for a physical therapy session," and "everyone thought he was getting better." The trial court further stated this case "was different than the situation in [McHoney[2]], which was the case that was most helpful."

The circuit court thereafter issued a written order finding Goodwin's statement was inadmissible as hearsay. Specifically, the circuit court found the medical records indicated Goodwin "was improving and was not in imminent danger of death" at the time he gave the identifying statement. The order referenced several points in the medical record, including Goodwin was "extubated on the 28th," " 'adequate on the floor, transferred out of [the intensive care unit], was making strides with physical therapy, and ambulating in the hall' "; "[h]e received a physical therapy consult on April 29th, and began physical therapy on April 30th"; "[o]n that day, he tolerated 5-15 minutes of uninterrupted exercise"; and his "May 4th death was listed as sudden and unexpected." The court also found

---

1. At the suppression hearing, the State advised the circuit court that Goodwin's family sent a note interpreting this statement as follows:
I received a note from the family. Take this how you will, your Honor. But their interpretation of his statement, I'm ready to go home was, I'm ready to pass. I'm ready to pass on to Heaven. And they wanted to make sure I conveyed that to you. That was their interpretation of him saying that.

2. *State v. McHoney*, 344 S.C. 85, 544 S.E.2d 30 (2001).

"neither the medical records nor the other evidence in the case demonstrates that the victim was aware of his imminent death when identifying the photograph of the defendant from the six-pack lineup." Additionally, the order stated: "[E]vidence presented at the pre[ ]trial hearing suggested that the victim was planning on seeking revenge against his assailant. This is inconsistent with both an awareness of imminent death as well as one who has given up all hope of survival." This appeal followed.

## STANDARD OF REVIEW

 "In criminal cases, the appellate court sits to review errors of law only." *State v. Baccus*, 367 S.C. 41, 48, 625 S.E.2d 216, 220 (2006). Thus, an appellate court "is bound by the [circuit] court's factual findings unless they are clearly erroneous." *Id.* "The determination by the [circuit] court of the preliminary facts, on which the competency of a dying declaration depends, will not be disturbed on appeal 'unless clearly incorrect and prejudicial.'" *State v. Bethea*, 241 S.C. 16, 23, 126 S.E.2d 846, 849-50 (1962) (quoting *State v. Smalls*, 87 S.C. 550, 551, 70 S.E. 300, 301 (1911)). "Affirmance is required when ... the conclusion of the [circuit court] is a reasonable inference from the evidence." *Id.* at 24, 126 S.E.2d at 850. "The admission or exclusion of evidence is left to the sound discretion of the [circuit court], whose decision will not be reversed on appeal absent an abuse of discretion." *State v. Winkler*, 388 S.C. 574, 583, 698 S.E.2d 596, 601 (2010) (quoting *State v. Saltz*, 346 S.C. 114, 121, 551 S.E.2d 240, 244 (2001)). "An abuse of discretion occurs when the conclusions of the [circuit] court either lack evidentiary support or are controlled by an error of law." *Id.* (quoting *State v. Pittman*, 373 S.C. 527, 577, 647 S.E.2d 144, 170 (2007)). "An abuse of discretion occurs when the [circuit] court's ruling is based on an error of law or, when grounded in factual conclusions, is without evidentiary support." *State v. Hawes*, 411 S.C. 188, 191, 767 S.E.2d 707, 708 (2015) (quoting *State v. Black*, 400 S.C. 10, 16, 732 S.E.2d 880, 884 (2012)).

## LAW/ANALYSIS

### I. Belief of Imminent Death

 The State argues the circuit court erred in finding Goodwin's statement identifying Brown is inadmissible hear-

say, asserting the record contains evidence Goodwin believed his death was imminent, citing his grandfather's and sister's testimonies, Goodwin's demeanor, and his medical condition. The State also argues the circuit court erred in relying on Goodwin's improvement when he later died from his injuries and the amount of time a declarant lives after giving the statement is immaterial. We disagree.

 "In a prosecution for homicide ..., a statement made by a declarant while believing that the declarant's death was imminent, concerning the cause or circumstances of what the declarant believed to be impending death" is not excluded by the hearsay rule when the declarant is unavailable as a witness. Rule 804(b)(2), SCRE. Imminent is defined as "[n]ear at hand; mediate rather than immediate; close rather than touching; impending; on the point of happening; threatening; menacing; perilous." *Imminent*, Black's Law Dictionary (5th ed. 1979). "[D]ying declarations are competent evidence, for or against the accused, upon preliminary proof of certain conditions." *Bethea*, 241 S.C. at 21, 126 S.E.2d at 848.

> The rules in regard to such testimony are well settled: 1st. That death must be imminent at the time the declarations in question are made. 2nd. That the declarant must be so fully aware of this as to be without any hope of life. * * * And 3rd. That the 'subject of the charge' must be the death of the declarant, and the circumstances of the death must be the subject of the declarations.

*Id.* at 21, 126 S.E.2d at 848-849 (quoting *State v. Johnson*, 26 S.C. 152, 153, 1 S.E. 510, 510 (1887)).

 "A declarant does not have to express, in direct terms, his awareness of his condition for his statement to be admissible as a dying declaration. The necessary state of mind can be inferred from the facts and circumstances surrounding the declaration." *McHoney*, 344 S.C. at 93, 544 S.E.2d at 33. "Furthermore, the length of time the declarant lives after making the dying declaration is immaterial. The focus is on the declarant's state of mind when the statement is made, not on the eventual outcome of the declarant's injuries." *Id.* at 93, 544 S.E.2d at 34.

A belief in imminent death is an extreme and powerful belief, as noted in *State v. Davis*, 138 S.C. 532, 137 S.E. 139

(1927). In *Davis*, the victim told his doctor: " 'I don't believe I am going to make it.' " *Id.* at 538, 137 S.E. at 140. However, the doctor "encouraged him to think that he would recover— with what success is not shown." *Id.* The supreme court found the victim's statement should not have been admitted, finding that while the victim "was uneasy and anxious about his condition, [the victim] had not given up all hope of life, and in this respect the test was not met." *Id.*

Here, evidence supports the circuit court's finding Goodwin's statement was not made while he believed his death was imminent. The circuit court's order noted specific facts in the medical record "that he was improving and was not in imminent danger of death at the time the statements were made." The order referenced portions of the medical record that provide Goodwin underwent surgery, was extubated, was transferred out of intensive care on the day of the statement, was able to begin physical therapy, and that his death was not expected. The court indicated recognition of Goodwin's "serious condition" at the time he identified Brown but relied on evidence in the medical record he was improving. The circuit court also found "neither the medical records nor the other evidence in the case demonstrates that the victim was aware of his imminent death" when he made the identifying statement.

The medical records support the circuit court's finding Goodwin was improving on the date Goodwin gave the identifying statement to Detective Fleming. Physician notes from that evening state "[h]e is up and out of bed-to-chair and PT has been consulted to work with ambulation." The medical records establish Goodwin successfully underwent two surgeries and was extubated prior to the statement. The "Case History" set forth in the autopsy report indicates "[t]he patient improved and had begun ambulation and physical therapy," after the second surgery, although an exact date is not given.

In *Bethea*, the victim identified the person who shot her to the responding sheriff and told the sheriff she was going to die. 241 S.C. at 22, 126 S.E.2d at 849. The victim also identified the person who shot her to a nurse at the hospital

and told the nurse she was going to die. *Id.* at 22-23, 126 S.E.2d at 849. Later, the victim told the nurse " 'that *if she died,*' " she did not want the person who shot her to come to the funeral. *Id.* at 23, 126 S.E.2d at 849. The victim's doctor testified "her course was progressively downward." *Id.* at 22, 126 S.E.2d at 849. The supreme court affirmed the circuit court's decision admitting the statements made by the sheriff and the nurse. *Id.* at 24, 126 S.E.2d at 850.

In the present case, however, Goodwin gave the statement identifying Brown after he had undergone two surgeries, been extubated, and was able to breathe on his own. On the same day Goodwin identified Brown, he was moved out of the intensive care unit and began to ambulate. Goodwin did not identify the assailant spontaneously but in response to questioning when Detective Fleming encouraged Goodwin to identify the person who shot him. Additionally, Goodwin was reluctant to name the perpetrator, which suggests a fear of reprisal, something inconsistent with a belief of impending death.

The case at bar is also in contrast to the facts in *McHoney* wherein the victim sustained a severe cut across her neck and seven stab wounds to her abdomen. 344 S.C. at 89-90, 544 S.E.2d at 32. After the attack, the victim was conscious but could not speak, and identified her attacker by nodding to indicate letters of her attacker's name as a nurse recited the alphabet. *Id.* at 90, 544 S.E.2d at 32. Even though the nurse sought to reassure the victim she would be alright, the victim "shook her head no." *Id.* The victim lost consciousness before being transported to another trauma center and never regained consciousness before dying two weeks later. *Id.* The supreme court found the circuit court "properly admitted the victim's identification of 'SP' as her killer under Rule 804(b)(2), SCRE." *Id.* at 94, 544 S.E.2d at 34.

Recognizing the challenge of discerning the state of mind of the declarant, we find the record contains evidence to support the circuit court's finding Goodwin's statement to Detective Fleming was inadmissible hearsay as it did not meet the dying declaration exception.

## II. Findings as to Goodwin's Revenge

The State also argues the circuit court erred in finding Goodwin was planning to seek revenge against his attacker, asserting no evidence was offered at the pretrial hearing to establish such intent. We agree.

The circuit court's written order stated:

Furthermore, evidence presented at the pre[ ]trial hearing suggested that the victim was planning on seeking revenge against his assailant. This is inconsistent with both an awareness of imminent death as well as one who has given up all hope of survival. Ex. A at 464.

"Ex. A at 464" appears to be a flowsheet of chaplain services indicating that a chaplain visited with the family of the victim on the day he was admitted to the hospital and again after Goodwin died. Brown's argument that Goodwin's lack of chaplain visits supports a finding of intended revenge is strained at best. Additionally, testimony Goodwin knew who shot him and feared his assailant does not support such a conclusion.

No evidence was presented at the suppression hearing that Goodwin planned to seek revenge against Brown, and the evidence Brown identified in his brief is not evidence Goodwin was planning to seek revenge. Therefore, we find the conclusion of the circuit court as to revenge was erroneous. However, this error did not prejudice the State.

"The determination by the trial court of the preliminary facts, on which the competency of a dying declaration depends, will not be disturbed on appeal 'unless clearly incorrect and prejudicial.'" *Bethea*, 241 S.C. at 23, 126 S.E.2d at 849-50 (quoting *Smalls*, 87 S.C. at 551, 70 S.E. at 301). "To warrant reversal, an error must result in prejudice to the appealing party." *State v. Black*, 400 S.C. 10, 16-17, 732 S.E.2d 880, 884 (2012).

Whether an error is harmless depends on the circumstances of the particular case. No definite rule of law governs this finding; rather, the materiality and prejudicial character of the error must be determined from its relationship to the entire case. Error is harmless when it "could not reasonably have affected the result of the trial."

*State v. Mitchell*, 286 S.C. 572, 573, 336 S.E.2d 150, 151 (1985) (quoting *State v. Key*, 256 S.C. 90, 93, 180 S.E.2d 888, 890 (1971)).

We find the circuit court did not rely solely on evidence of revenge to support a finding of hearsay but relied on other evidence, including the medical records. Notably, the finding of revenge appears in the written order, but the court did not rely on the finding of revenge in its verbal ruling. Moreover, the finding of revenge in the written order is an additional reason given by the circuit court for finding Goodwin was not aware of his imminent death when he made the statement. The circuit court found "neither the medical records nor the other evidence in the case demonstrates that the victim was aware of his imminent death when identifying the photograph. . . ." The court supported its ruling by first stating: "on April 29th, the victim's medical condition was improving." The court next stated: "Furthermore, evidence presented at the pre[ ]trial hearing suggested that the victim was planning on seeking revenge against his assailant." Thus, the finding of revenge is in addition to a finding of an improved medical condition as set forth in the medical records. As such, we do not find this error prejudiced the State and affirm the admission of the identifying statement.[3]

## CONCLUSION

For the aforementioned reasons, the decision of the circuit court excluding the identifying statement as hearsay is

**AFFIRMED.**

WILLIAMS, J., and LEE, A.J., concur.

---

3. Based on our findings regarding hearsay, we decline to address Brown's assertion the identifying statement was inadmissible as a violation of the Confrontation Clause of the United States Constitution and the South Carolina Constitution as an additional sustaining ground. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (holding the appellate court need not address remaining issues when the previous issue is dispositive).