NOT DESIGNATED FOR PUBLICATION

No. 122,568

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ROBERT DARNELL RICHARD JR.,
*Appellant*.


MEMORANDUM OPINION

Appeal from Wyandotte District Court; AARON T. ROBERTS, judge. Opinion filed August 27, 2021. Affirmed.

*Peter Maharry*, of Kansas Appellate Defender Office, for appellant.

*Daniel G. Obermeier*, assistant district attorney, *Mark A. Dupree Sr.*, district attorney, and *Derek Schmidt*, attorney general, for appellee.


Before SCHROEDER, P.J., MALONE, J., and BURGESS, S.J.


PER CURIAM: Robert Darnell Richard Jr. appeals his convictions of intentional second-degree murder and robbery involving the shooting death of his ex-girlfriend, Krystal Swygert. Among Swygert's last words before she died in surgery from a gunshot wound were that Richard was the person who shot her. Richard's main claim on appeal is that the district court erred by admitting Swygert's identification into evidence as a dying declaration. Richard also claims the district court erred by admitting into evidence some of his Facebook messages about the incident and a surveillance video showing Richard and Swygert together just a few minutes before the shooting.

1

This appeal also presents sentencing issues. The district court partially granted Richard's motion for a downward durational departure sentence, but Richard claims the district court should have granted a greater departure. The State cross-appeals, claiming the district court lacked substantial and compelling reasons to grant any departure. Finding no reversible error, we affirm the district court's judgment in all respects.

FACTUAL AND PROCEDURAL BACKGROUND

*A shooting outside a Burger King and a Taco Bell*

On December 22, 2018, while working her late afternoon shift at a Burger King in Kansas City, Maria del Real witnessed an altercation between Richard and Swygert. Real saw the pair sitting at a table together; Swygert was wearing a pink hat. The two began talking, possibly arguing, but eventually stepped outside where they engaged in a physical fight. Richard came back into the restaurant and asked Real about the restaurant's Wi-Fi. Swygert also came back in and sat down by herself at a table. Richard eventually joined her at the table. He then physically took Swygert's hat off her head, set the hat on the table, and left the restaurant. Swygert followed Richard out of the restaurant about a minute later.

Meanwhile, Mary Hittle and her children were in a vehicle in the drive through line of a nearby Taco Bell. While waiting for their order, Hittle heard a couple of "bang-bang" noises that she at first thought were backfiring from a car. When Hittle reached the drive through window, a Taco Bell employee told her that someone had just entered the Taco Bell with a gunshot wound. Hittle, an emergency room nurse with around 20 years' experience, exited her car and ran into the Taco Bell to assist. Once inside, Hittle found Swygert rolling on the floor of the restaurant, moaning in pain.

Jeff Conner was already inside the Taco Bell when Swygert rushed in saying she was shot. Swygert made her way to the front register before collapsing on the floor. Conner saw a wound on the left side of Swygert's abdomen and used napkins to try to stop any bleeding. After a few minutes Hittle arrived to help. She noticed a clear liquid—not blood—coming from the wound but did not see an exit wound. Hittle tried to get Swygert to calm down and slow her breathing to minimize the risk of further damage as she believed that Swygert was likely bleeding internally.

Swygert eventually screamed and writhed in pain. Conner asked Swygert who shot her, to which she responded that it was her "ex-boyfriend, Robert Richard," and then she repeated Richard's name several times. Hittle also heard these statements. According to Conner, Swygert appeared "very worried," and she prayed to Jesus for help throughout the incident. Emergency medical services (EMS) soon arrived at the scene.

Officers Brandon Nemec and Daniel Floyd also responded to the incident. When they arrived at the Taco Bell, Swygert was on the floor with EMS personnel who administered medical care. The officers asked Swygert who shot her. Swygert at first said it was her "boyfriend," and then identified him as her "ex, Robert." When asked for a last name and birthdate for Richard, Swygert provided both. She also provided the officers with a description of Richard and the clothes he was wearing. Nemec broadcasted Swygert's identification of Richard to other officers.

The EMS team took Swygert to a nearby hospital, but she died during surgery. Forensic pathologist Dr. Altof Hosain determined that Swygert's death was caused by the single gunshot wound to her side and the internal bleeding. Hosain found that Swygert was under the influence of methamphetamine at the time of her death.

Kansas City Police Captain Angela Garrison also responded to the incident and participated in the ensuing investigation. While Garrison was still at the scene, Theo

3

Quiroz contacted her and identified himself as Richard's brother. According to a police affidavit, Quiroz told Garrison that Richard confessed that "he shot 'the girl' after she ran up to him on the street and threatened him with a knife." He also later arranged a three-way call to allow Garrison to talk to Richard. Garrison hoped the conversation would persuade Richard to turn himself in for questioning.

Police gathered evidence from the crime scene and from the nearby Burger King, including surveillance footage showing Richard and Swygert together at the Burger King right before the shooting. Police also obtained videos from Taco Bell depicting the scene there. An officer also recovered a shell casing from a bullet. Detective Tiffany Burgdorf obtained a warrant for the Facebook records of Swygert, Richard, and a third person. The three accounts were also public and accessible by simply visiting the pages. In one of Richard's Facebook messages dated the day after Swygert's death, he explained that he would never hurt anyone unless his life was in danger and he mentioned that a lady had chased him, tried to stab him, and pushed him into moving cars.

During the three-way phone call between Richard, Garrison, and Quiroz, Richard admitted that he was at the Burger King with Swygert and claimed that he approached Swygert and took her hat because she had taken his phone charger. Richard also claimed that when Swygert left the Burger King, he followed her down the sidewalk but when he heard a gun go off nearby, he ran away. Richard also told Garrison that Swygert was on drugs but "'he didn't know her like that.'" Richard later told the police that he did not know Swygert very well. But officers discovered evidence showing Richard and Swygert were at some point involved in a romantic relationship. This evidence included conversations between Richard and Swygert on Facebook Messenger and photographs of them in an intimate position in bed. The police later arrested Richard in Wichita.

4

*Proceedings in district court*

On January 28, 2019, the State charged Richard with one count of intentional second-degree murder, but the State later added one count of robbery based on Richard taking Swygert's hat from her person. Before trial, Richard moved to exclude Swygert's statements at the Taco Bell identifying Richard as the person who shot her. The district court considered the motion at the start of trial and found that the statements were admissible as dying declarations. The district court also found that Swygert's statements to the police officers were admissible under the continuing emergency doctrine. But the district court rejected the State's alternative claim that the statements were admissible under the excited utterance exception to the hearsay rule.

At trial, Hittle, Conner, Nemic, Floyd, Garrison, Hosain, Real, Burgdorf, and other witnesses testified for the State. The State also introduced exhibits including the Taco Bell videos, the Burger King surveillance videos, and the Facebook messages. The videos and witness testimony showed that Swygert staggered into the Taco Bell with a gunshot wound about 5:07 p.m., about a minute or two after she left the Burger King for the final time. In the State's opening statement, the prosecutor suggested a possible motive for the shooting was that Richard found out that Swygert was pregnant with someone else's child, but the State did not pursue this theory during the rest of the trial.

Richard did not testify at trial, nor did he call any witnesses. In his closing argument, he contended that the State failed to present sufficient evidence to prove he intentionally killed Swygert or that he even shot Swygert. Richard challenged the reliability of Swygert's identification of him after being shot, suggesting she was high and losing consciousness at the time. He also contended that the State's evidence showed that he only committed theft, not robbery.

5

At the jury instruction conference, the district court found that no lesser offense instructions were appropriate on the homicide charge. Defense counsel agreed that he could not think of any lesser offenses that would apply and rejected an instruction on self-defense. The district court gave an instruction for theft as a lesser included offense of robbery. The jury convicted Richard of second-degree murder and robbery.

*Sentencing*

A presentence investigation (PSI) report revealed Richard had a criminal history score of B based on two person felony convictions in 2003. Richard's standard presumptive prison sentence for second-degree murder was 586 months' imprisonment. Richard moved for a durational departure, arguing Swygert was the aggressor, his prior convictions were old, and his prior person felonies—robbery and conspiracy to commit robbery—arose out of one incident. Richard asked that his prior person felonies be treated as one person felony, to allow him to receive a sentence for an offender with a criminal history score of C, which would be 272 months' imprisonment. The State opposed Richard's departure motion, recommended the standard sentence for each count, and asked that the sentences for each count run consecutively.

The district court granted Richard's departure motion in part. The district court split the difference between the presumptive term for the homicide of 586 months and Richard's request for 272 months and sentenced Richard to 429 months' imprisonment. The district court also imposed a concurrent sentence of 32 months' imprisonment for the robbery. The district court found the age of Richard's criminal history and the lack of similar offenses in his criminal history provided substantial and compelling reasons to depart from the presumptive sentence for the homicide. The district court also found the departure was warranted based on what the court believed was a disproportionate difference in the term of the presumptive sentence for an offender with a criminal history

6

score of C versus B. Richard timely appealed the district court's judgment. The State cross-appealed, challenging the legality of the departure sentence.

DID THE DISTRICT COURT ERR IN ADMITTING SWYGERT'S STATEMENTS IDENTIFYING RICHARD AS THE PERSON WHO SHOT HER?

Richard first claims the district court erred in admitting Swygert's statements at the Taco Bell identifying Richard as the person who shot her. More specifically, Richard argues that the district court erroneously found that Swygert's statements identifying him as the shooter were dying declarations under K.S.A. 2018 Supp. 60-460(e). He also argues that the district court erred by admitting the statements to the police officers under the continuing emergency doctrine. Richard also contends that the admission of the evidence violated his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution. Finally, he argues the admission of this evidence was not harmless error.

The State argues that Swygert's statements were properly admitted as either dying declarations or an excited utterance. As for Richard's Confrontation Clause challenge, the State asserts that Richard failed to preserve this issue because he did not object to the statements at trial on constitutional grounds. In any event, the State argues that the statements were nontestimonial, and the admission of the evidence did not violate the Confrontation Clause. Finally, the State asserts that any error was harmless.

*Preservation and standard of review*

The State contends that Richard's constitutional claim is not preserved for appeal. The State asserts that Richard objected to the evidence at trial only on hearsay grounds and should be precluded from raising an appellate argument based on the Confrontation Clause. Cf. *State v. Bryant*, 272 Kan. 1204, 1208, 38 P.3d 661 (2002) (finding hearsay objections at trial inadequate to preserve Confrontation Clause argument for appeal).

7

"K.S.A. 60-404 dictates that evidentiary errors shall not be reviewed on appeal unless a party has lodged a timely and specific objection to the alleged error at trial." *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009). Before trial, Richard moved to exclude Swygert's statements at the Taco Bell identifying him as the person who shot her, arguing the statements were hearsay and violated his constitutional rights under the Sixth Amendment's Confrontation Clause. The district court considered the motion before voir dire and denied the motion on its merits, finding the dying declaration exception to the hearsay rule applied. The district court also found that Swygert's statements to the police were admissible under the continuing emergency doctrine.

At trial, Richard objected to the statements during Hittle's testimony based on hearsay. At a sidebar discussion, Richard added that he was "rais[ing] all the issues in [his] motion in limine." The district court overruled the objection and noted Richard's continuing objection. In a sidebar discussion during Connor's testimony, Richard stated that he wanted to "raise all the same issues" that he raised with Hittle's testimony. Although Richard did not specifically state that his trial objections were grounded in the Confrontation Clause, we find there was a sufficient reference to his motion in limine and the constitutional challenge is preserved as to the testimony of Hittle and Connor.

Richard also objected to the admission of Swygert's statements during Nemec and Floyd's testimony but he at no point argued that those objections were based on the Sixth Amendment. During Nemec's testimony, Richard simply stated, "Objection, hearsay." Likewise, during Floyd's testimony, Richard objected to the evidence, alleging it was hearsay and cumulative. Thus, we find that Richard's Confrontation Clause argument is not properly preserved as to the testimony of the two police officers.

Turning to our standard of review, a court's consideration of the admissibility of evidence can require application of statutory rules controlling the admission and exclusion of certain types of evidence. Whether a particular legal principle or statutory

8

rule governs the admission of evidence is a question of law subject to de novo review. A principle or rule, however, is applied as a matter of law or as an exercise of the district court's discretion, depending on the applicable rule. *State v. Miller*, 308 Kan. 1119, 1166, 427 P.3d 907 (2018).

In *State v. Reed*, 302 Kan. 390, 401, 352 P.3d 1043 (2015), our Supreme Court stated that an appellate court "review[s] a district judge's decision on the admission of hearsay evidence for an abuse of discretion." Judicial discretion is abused if a court's action is (1) arbitrary, fanciful, or unreasonable, (2) based on an error of law, or (3) based on an error of fact. *State v. Ingham*, 308 Kan. 1466, 1469, 430 P.3d 931 (2018). The *Reed* court added that "[i]f the issue is whether the trial court complied with specific statutory requirements for admitting evidence or whether an evidentiary ruling violated a defendant's constitutional rights, our review is de novo." 302 Kan. at 402.

*Dying declarations exception to the hearsay rule*

Our Legislature defines hearsay evidence as "[e]vidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated." K.S.A. 2018 Supp. 60-460. Unless a valid exception applies, hearsay evidence is inadmissible. K.S.A. 2018 Supp. 60-460. The concept of the rule precluding hearsay evidence is based on the general principle "that when a statement is offered as evidence of the truth of the matter stated, the credibility of the declarant is the basis for its reliability, and the declarant must therefore be subject to cross-examination." *State v. Becker*, 290 Kan. 842, 846, 235 P.3d 424 (2010) (citing *Boldridge v. State*, 289 Kan. 618, 634, 215 P.3d 585 [2009]).

Dying declarations are a deeply rooted exception to the hearsay rule with origins in the common law. The historical rationale for admitting a person's dying declarations into evidence was that the realization of impending death serves as an incentive to be

truthful equal to that of taking an oath. *Thurston v. Fritz*, 91 Kan. 468, 471, 138 P. 625 (1914). In Kansas, the admission of dying declarations was at first restricted to criminal cases involving homicide, but the rule was later extended to civil cases. 91 Kan. at 474-75.

The dying declarations exception to the hearsay rule is codified at K.S.A. 2018 Supp. 60-460(e). Under this exception, a court may allow a jury to hear an out-of-court statement made "by a person unavailable as a witness because of the person's death if the judge finds that it was made: (1) Voluntarily and in good faith; and (2) while the declarant was conscious of the declarant's impending death and believed that there was no hope of recovery." K.S.A. 2018 Supp. 60-460(e).

In ruling on Richard's motion in limine to exclude Swygert's statements at the Taco Bell, the district court made extensive findings, based on Hittle's preliminary hearing testimony, that Swygert made her statements voluntarily and in good faith and that she was conscious of her "imminent death" when the statements were made. More specifically, the district judge found:

> "I don't think there's any question, whatsoever, that the victim here—it was voluntar[y] and in good faith. There's no doubt [Swygert] was shot, struggling in a lot of pain, wouldn't have had time to, with the condition she was in, by all accounts, to try and deceive and connive trying to come up with some kind of story to get somebody in trouble. So I do find this was made voluntarily and in good faith.
>
>     "[A]s far as whether or not she believed that she was mortally injured and would have no ability to recover from those injuries. That's a tough question for any fact-finder or Court to consider when that person eventually dies because it almost requires lay people to have extensive medical knowledge. . . . Most of this is from Ms. Hittle's testimony in the preliminary hearing when Ms. Hittle comes in, I think she said a lady walked into Taco Bell and had been shot, but by the time she came in, she was no longer walking, she was on the ground, not standing up, she testified that she was moaning and grimacing, groaning in pain, that's a quote.

10

"She also testified there was a man standing over her holding a, quote, pressure dressing. Common sense tells us that someone is doing that when some type of liquid is emanating or oozing from your body, stopping something from coming out of your body, putting pressure. Usually it's blood, in this case looks like it may not have been. She kept saying over and over it hurts, it hurts, she was not talking normally and she stated that she was breathing really fast like hyperventilating . . . . Again, any liquid oozing out of your body, out of a hole in your stomach, I don't believe would be good. The nurse, Ms. Hittle, tried to calm her down by slowing her breathing because the nurse testified she thought that was making things worse, breathing really fast, wasn't slowing down and she said it didn't work. She continued to breath quite rapidly. So we have someone who, I don't know if Ms. Hittle identified herself as a nurse, but she tried to order the victim to slow down and either she was unwilling or unable to. That certainly seems to show a sign of distress there.

"Also, since the victim was not a doctor, then she's not able to know with any type medical certainty to know the damage from a gunshot. We can agree, anyone getting shot, especially in your abdomen, is not a good thing, no matter what type of gun or caliber of bullet or anything like that. So there's certainly some uncertainty when it comes to Miss Swygert's medical knowledge and knowing exactly what was going on with her and the damage done to her body. We're allowed to impute common sense into the situation.

"Look, she was not shot in the foot or the hand, it was not a grazing shot, it was a shot to the abdomen that was extremely painful to the victim. She was riling back and forth in pain, couldn't slow her breathing down, saying it hurts, it hurts, I believe that any reasonable person shot in the stomach accompanied by extreme pain would be in fear of imminent death . . . . Nobody wants to get shot. I'm sure everyone who gets shot, does get scared, but I don't think people are sitting there saying, well, I only got shot once in the stomach, I'll probably live. I think any reasonable person would be in fear of imminent death. No one there was telling her that she would be fine, that she was going to make it. There was no record of any reassurance by anyone, look, you'll be okay, we'll get you to the hospital, there's nothing like that. . . .

"Based upon the totality of the circumstances, I'm going to find that the dying declaration exception to the confrontation clause does apply and that Mr. Richard's rights are not violated so the motion in limine is denied upon that."

On appeal, Richard does not challenge the district court's finding that Swygert's statements were made voluntarily and in good faith. But Richard argues that "the evidence here does not show that [Swygert] believed she was facing impending death." He claims that Swygert's actions of "moaning and groaning" and "rolling back and forth saying 'it hurts'" were not enough to show Swygert believed she was dying. Richard also emphasizes that Swygert was not bleeding but instead was leaking a clear liquid and she did not lose consciousness while she was still at the Taco Bell.

The Kansas Supreme Court addressed the dying declarations exception to the hearsay rule in *State v. Jones*, 287 Kan. 559, 197 P.3d 815 (2008). In that case, a victim sustained multiple gunshot wounds which left him paralyzed in all four limbs. While being transported to the hospital, the victim asked one of the two paramedics who were working on him whether he was going to die. The paramedic did not directly respond to the question, but he spoke with the victim to try to keep him awake and to confirm that his airway was open. The paramedic asked the victim if he knew who had shot him, and the victim responded by saying the defendant's nickname. The victim ultimately died from complications caused by the paralysis.

The district court allowed the victim's identification of the defendant to be admitted into evidence, finding the victim had reason to believe he was dying at the time he made the statement. On appeal, our Supreme Court agreed that the evidence supported the district court's finding. The court noted the victim "had sustained multiple gunshot wounds which left him paralyzed in all four limbs. Pointedly, [the victim] asked one of the two paramedics who were working on him in the ambulance whether he was going to die, manifesting an awareness that he was on the brink of death." 287 Kan. at 564.

In *State v. Bonner*, No. 102,053, 2010 WL 3211707 (Kan. App. 2010) (unpublished opinion), the defendant stabbed the victim, who called out to a neighbor 30 minutes later. The neighbor looked in the apartment and saw the victim lying on the floor

12

with his legs and feet "thrashing." 2010 WL 3211707, at *1. The victim told the neighbor he had been stabbed and that it was "'[t]hat black kid, Rico'" who did it and that "'he didn't think he was going to make it.'" 2010 WL 3211707, at *1. Police arrived and saw the victim was in "a great deal of distress and could not move." 2010 WL 3211707, at *1. When asked by police who stabbed him, the victim responded "'Rico.'" 2010 WL 3211707, at *1. The police asked the victim if he was referring to the defendant and he said, "'Yeah.'" 2010 WL 3211707, at *1 The victim died in the hospital from his wounds.

On appeal, the defendant challenged the victim's statements to the police as inadmissible hearsay. This court found that the statements qualified as dying declarations, noting that the victim had sustained multiple stab wounds and had told his neighbor that he did not think he would make it. 2010 WL 3211707, at *4. This court also observed that the victim died two hours later from the stab wounds.

Our Supreme Court most recently addressed the dying declarations exception to the hearsay rule in *Reed*. In that case, the victim was shot one time in the stomach from close range. Immediately after the shooting, the victim told his sister and police officers that he was shot by someone named "'Micky.'" 302 Kan. at 393. The victim later died at the hospital. At a pretrial hearing to decide whether the victim's statements would be admissible as dying declarations, the district court found that when the victim made the statements, he "'had difficulty speaking, difficulty breathing, he was coughing up blood, he was very "panicked," and he knew he had been shot.'" 302 Kan. at 394. The district court also found the victim "'was writhing in pain'" and was "'pretty much hysterical.'" 302 Kan. at 394-95. Observing that the victim died a short time later at the hospital, the district court found there was no question "'the facts support that he was conscious and very aware of his impending death and he had no hope of recovery.'" 302 Kan. at 395.

On appeal, the defendant asserted there was an inadequate factual basis for the district court's finding that the victim was conscious of his impending death and believed

13

there was no hope of recovery when he made his statements. The defendant argued that the victim was trying to stand up when he made the statements and pointed out that there was no testimony that police officers or emergency medical personnel explicitly informed the victim that he was dying. Our Supreme Court rejected these arguments and observed that the district court's findings were supported by the evidence. 302 Kan. at 403. Our Supreme Court summarized the district court's finding and observed that appellate courts do not reweigh the evidence. 302 Kan. at 404. Without engaging in any further analysis, our Supreme Court found that "it cannot be said the district judge's decision to allow testimony about [the victim's] out-of-court statements as dying declarations was 'arbitrary, fanciful, or unreasonable.'" 302 Kan. at 404.

Returning to our facts, Swygert entered the Taco Bell with a serious gunshot wound to her abdomen. She collapsed on the floor and was screaming and writhing in pain. She was also having difficulty breathing. Hittle, an emergency room nurse, believed that Swygert was likely bleeding internally. Connor testified that Swygert appeared "very worried," and she prayed to Jesus for help throughout the incident. When asked who shot her, Swygert responded that it was her "ex-boyfriend, Robert Richard." She repeated his name several times and described Richard to the police. EMS was called to the scene to take Swygert to the hospital. She died a brief time later in surgery.

Richard's case is distinguishable from *Jones* and *Bonner* because the victims in those two cases verbally expressed a concern about surviving their injuries. We do not have that fact here. Richard focuses on the fact that Swygert "did not make any statement indicating she thought she was going to die" to support his assertion that the "evidence does not show that [Swygert] believed she was facing death" when she identified Richard as the person who shot her.

Richard's case would indeed be easier to decide if Swygert had verbalized a concern to someone about whether she would survive her injuries. But the absence of this

14

evidence should not prevent a court from finding that Swygert's statements qualify as dying declarations under K.S.A. 2018 Supp. 60-460(e). In *Reed*, a case with similar facts to Richard's, the victim suffered a gunshot wound to the abdomen. The victim did not ask any questions or make any statements to anyone expressing a concern that he might die from his injuries. But the district court observed the victim was writhing in pain, had difficulty breathing, was panicked, and "'knew he had been shot.'" 302 Kan. at 394. Based on the evidence, the district court found the victim was conscious of his impending death and had no hope of recovery. On appeal, our Supreme Court expressed no hesitancy in finding the victim's statements were supported by the evidence and were admissible as dying declarations.

In Richard's case, the district court found that "any reasonable person shot in the stomach accompanied by extreme pain would be in fear of imminent death." We agree with the district court's common-sense finding. A victim does not have to verbalize an awareness that his or her death is imminent for a statement to be admissible as a dying declaration. Instead, the necessary state of mind can be inferred from the facts and circumstances surrounding the declaration.

Cases from other states support this conclusion. In *State v. Owens*, 368 Wis. 2d 265, 878 N.W.2d 736 (Wis. App. 2016), police responded to a reported shooting. Officers found the victim lying on the ground suffering from a gunshot wound to the chest. The victim was "pale, gasping for air, and was going in and out of consciousness." 368 Wis. 2d at 270. Police asked the victim who shot him, and the victim identified the shooter as the defendant. The victim died in the ambulance on the way to the hospital.

At trial, the victim's statement identifying the defendant as his killer was admitted into evidence as a dying declaration. On appeal, the Wisconsin Court of Appeals found no error, stating: "For a statement to be admissible as a dying declaration, the declarant need not specifically say their death is imminent." 368 Wis. 2d at 273. The court stated

15

that the declarant's belief of impending death can be inferred from the "'nature and extent of the wounds inflicted.'" 368 Wis. 2d at 274. The court then reasoned that "[b]eing shot in the chest would cause any rational adult to fear imminent death." 368 Wis. 2d at 274. The court further explained that the inference was even stronger considering the victim was gasping for air and going in and out of consciousness.

"'A declarant does not have to express, in direct terms, his awareness of his condition for his statement to be admissible as a dying declaration. The necessary state of mind can be inferred from the facts and circumstances surrounding the declaration.'" *State v. Brown*, 421 S.C. 337, 344, 806 S.E.2d 724 (S.C. App. 2017); see also *Bush v. State*, 295 So. 3d 179, 203 (Fla. 2020) ("'[I]t is not necessary that the declarant "make express utterances" that he would never recover'" for dying declaration to be admissible.); *Chapman v. State*, 196 So. 3d 322, 334 (Ala. Crim. App. 2015) (declarant's belief that death was imminent can be inferred from the declarant's statements, condition, or conduct); *Wiggins v. State*, 295 S.E.2d 684, 685 (Ga. 2014) ("The testimony which is introduced as a dying declaration does not have to contain any statement by the deceased to the effect that he is conscious of his impending death at the time the declaration is made; this may be inferred from the nature of the wounds and other circumstances."); *State v. Largo*, 278 P.3d 532, 539 (N.M. 2012) ("'[I]f it can reasonably be inferred from the state of the wound or the state of the illness that the dying person was aware of his [or her] danger, then the requirement of impending death is met.").

Swygert had collapsed with a gunshot wound to her abdomen, and EMS was transporting her to the hospital. Any reasonable person would know that such a wound could be fatal. We find it significant that Swygert was praying to Jesus throughout the incident. Conner testified that "some of her last words [were] pray[ers]." Although Swygert did not ask any questions or make any statements indicating her awareness that death was imminent, we find her necessary state of mind can be inferred from the circumstances. The district court's extensive findings are supported by the evidence in the

16

record. Given the circumstances surrounding Swygert's death, including her physical and emotional state at the Taco Bell, we conclude the district court did not err in admitting Swygert's statements as dying declarations under K.S.A. 2018 Supp. 60-460(e).

Finally, the State argues alternatively that Swygert's statements at the Taco Bell were admissible under the excited utterance exception to the hearsay rule at K.S.A. 2018 Supp. 60-460(d)(2). But the district court considered and rejected this claim, and the State did not cross-appeal from this adverse ruling. Thus, we lack jurisdiction to address the State's alternative claim under the excited utterance exception. See *Cooke v. Gillespie*, 285 Kan. 748, 755, 176 P.3d 144 (2008) ("We have clearly held that before an appellee may present adverse rulings to the appellate court it must file a cross-appeal.").

*Confrontation Clause challenge*

The Sixth Amendment to the United States Constitution states:  "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The Confrontation Clause bars admission of "testimonial hearsay." *Crawford v. Washington*, 541 U.S. 36, 53, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). Generally, if a statement is found to be testimonial it must be excluded as evidence unless a court finds that the declarant is unavailable as a witness and the defendant had a prior opportunity to cross-examine the declarant. *Reed*, 302 Kan. at 402-03.

Richard argues that Swygert's statements in the Taco Bell were testimonial and because she was not subject to cross-examination, the admission of her statements violated his rights under the Confrontation Clause. But as our Supreme Court noted in *Reed*, the United States Supreme Court has long recognized "that dying declarations merit special handling." 302 Kan. at 403; see *Crawford*, 541 U.S. at 56 n.6 (noting existence of exception without deciding whether it was specifically incorporated in the Sixth Amendment). And our Supreme Court stated in another post-*Crawford* case that

17

"we are confident that, when given the opportunity to do so, the [United States] Supreme Court would confirm that a dying declaration may be admitted into evidence, even when it is testimonial in nature and is unconfronted." *Jones*, 287 Kan. at 569.

Still, the United States Supreme Court has never expressly ruled that dying declarations provide an exception to a defendant's constitutional rights under the Confrontation Clause. Swygert's statements at the Taco Bell were made to both lay witnesses and the police. As the *Crawford* Court explained, statements to police are often testimonial. 541 U.S. at 52. But under one of the recognized exceptions, a statement to police may be deemed nontestimonial and, thus, admissible if the court finds that the police's primary purpose of eliciting the statement was to address an ongoing emergency. See *Michigan v. Bryant*, 562 U.S. 344, 361, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011). In that case, Michigan police dispatched to a gas station parking lot found Anthony Covington mortally wounded. Covington told police that he had been shot by Richard Bryant outside Bryant's house and had then driven himself to the parking lot. The United States Supreme Court, without addressing Covington's statements as a dying declaration, ultimately held that Covington's identification and description of Bryant and the location of the shooting were not testimonial statements because they had a primary purpose to enable police to meet an ongoing emergency. 562 U.S. at 377-78.

Richard's Confrontation Clause challenge is not properly preserved as to the testimony of the two police officers, Nemec and Floyd. But even if it were, Swygert's statements to the police officers, including her identification of Richard as the shooter, were made for the primary purpose of enabling the police to meet an ongoing emergency. Under *Bryant*, the statements were nontestimonial, and the admission of the evidence did not violate Richard's rights under the Confrontation Clause.

Hittle and Conner are not police officers, so Swygert's statements to them do not fall under the holding in *Bryant*. But even if Swygert's dying declarations to Hittle and

18

Conner are considered testimonial, it is likely that the admission of this evidence did not violate the Confrontation Clause. See *Reed*, 302 Kan. at 403; *Jones*, 287 Kan. at 569. And finally, we observe that because Swygert's statements to the police are admissible under the holding in *Bryant*, any error in admitting the same statements made to Hittle and Conner would be harmless beyond a reasonable doubt. See *State v. Nguyen*, 281 Kan. 702, Syl. ¶ 6, 133 P.3d 1259 (2006) ("Violation of the Confrontation Clause is subject to analysis under the federal harmless error rule."). Thus, Richard has no right to any relief from his convictions based on a violation of his confrontation rights.

DID THE DISTRICT COURT ERR IN ADMITTING RICHARD'S FACEBOOK MESSAGES?

Richard next claims the State failed to properly authenticate or lay a foundation for State's Exhibit 32—a collection of information obtained from Richard's public Facebook page and private messages between him and a third party. The exhibit was admitted through the testimony of Detective Burgdorf who obtained a warrant for the Facebook records. Richard's claim focuses on a conversation police obtained from his Facebook Messenger account, which he contends the State failed to prove were his and were inadmissible hearsay. The State takes the opposite position and asserts that the evidence was admissible under the party admissions exception to the hearsay rule.

Richard objected to the admission of State's Exhibit 32 at trial. During the ensuing bench conference, defense counsel argued that the State had not—and likely could not—provide a sufficient foundation for the evidence, and the evidence was hearsay and irrelevant. The parties engaged in a long discussion before the district court allowed the State to proceed. When the State moved to admit the exhibit in front of the jury, defense counsel objected again, stating, "Same objection." Over the objection, the district court admitted the evidence. Based on Richard's timely objection to the evidence, this issue is preserved for appellate review. See K.S.A. 60-404.

19

When an appellate court reviews a decision to admit evidence, it first considers whether the evidence is relevant and then applies the statutory rules that govern the admission or exclusion of evidence. *State v. Jenkins*, 311 Kan. 39, 44, 455 P.3d 779 (2020). "All relevant evidence is admissible unless prohibited by statute, constitutional provision, or judicial decision." *State v. Meggerson*, 312 Kan. 238, 252, 474 P.3d 761 (2020); see K.S.A. 60-407(f). To the extent this issue requires interpretation of a statute or a determination of which statutory rule applies, it is subject to de novo review. See *State v. Alvarez*, 309 Kan. 203, 205, 432 P.3d 1015 (2019); *Miller*, 308 Kan. at 1166.

Under K.S.A. 60-464, authentication of a writing is required before it may be received in evidence. This court generally reviews evidentiary issues related to authentication and foundation for an abuse of discretion. See *State v. Banks*, 306 Kan. 854, 865, 397 P.3d 195 (2017); *State v. Davis*, 41 Kan. App. 2d 1037, 1047, 207 P.3d 281 (2009). Moreover, the erroneous admission of evidence is subject to review for harmless error under K.S.A. 2018 Supp. 60-261. But if the error implicates a constitutional right, the effect of that error must be assessed under the constitutional harmless error standard: whether the party benefiting from the error proves beyond a reasonable doubt that the error would not or did not affect the outcome of the trial in light of the entire record. *State v. Santos-Vega*, 299 Kan. 11, 24, 321 P.3d 1 (2014).

Richard's challenge to the Facebook messages is similar to an issue raised in *State v. Dickerson*, No. 116,628, 2018 WL 5851444 (Kan. App. 2018) (unpublished opinion). In that case, as here, the defendant objected to the State's use of Facebook messages based in part on authenticity. The *Dickerson* court interpreted the defendant's appellate claim as challenging the sufficiency of the State's proof showing the messages were his or that they were accurate. The *Dickerson* court found that "a party seeking the admission of such writings has a small burden of proving authenticity," and after reviewing similar cases determined that the messages could be admitted based on "reasonable minimal circumstances." 2018 WL 5851444, at *6-7 (citing K.S.A. 60-464).

20

The pertinent information in the Facebook records challenged here included a conversation between Richard and Shalon Marie Henderson. In the conversation with Henderson, timestamped the day after Swygert's death, Richard mentioned that a lady chased him, tried to stab him, and pushed him into moving cars. Richard also sent Henderson a link to a news story reporting Swygert's death with a statement imploring Henderson to believe that he would not hurt someone unless his life was in danger.

At trial, defense counsel argued that because the State was trying to admit this information under the business records exception for hearsay in K.S.A. 2018 Supp. 60-460(m), the State needed to offer an affidavit from the Facebook records custodian to lay a proper foundation for the evidence. The State explained that Burgdorf had received a custodian's affidavit but no longer had the affidavit in her possession. Still, the State alleged that Burgdorf's testimony that she had received the affidavit was enough to authenticate the information provided in the messages. The State also pointed out that some of the evidence taken from Facebook was publicly accessible. The district court found that the absence of the records custodian's affidavit went to the weight of the evidence and not its admissibility. Thus, the district court overruled Richard's objection to the exhibit.

The State then presented circumstantial evidence before the jury to establish that the exhibit was what the State purported it to be—Richard's Facebook conversation. Burgdorf testified that she obtained a warrant to search three Facebook profiles, including those belonging to Richard and Swygert. She explained that she viewed Richard and Swygert's profiles before executing the warrant to ensure she received information from the correct Facebook accounts. She then received hyperlinks that provided her access to the full Facebook profiles and downloaded the information. Burgdorf then compared the downloaded information to the information she could view publicly to check that the information was accurate. She believed she received the correct information based on the conversations and photographs in the information Facebook provided.

State's Exhibit 32 also included a photograph of Richard and his name. Burgdorf compared the photograph and information to ensure it was correct. Together this evidence supported a reasonable inference that Richard "wrote the messages, which was adequate proof of their authenticity and supported their admission into evidence. Any doubt that [Richard] wrote the messages and any conflicting evidence goes to the weight of the evidence, not the exhibits' admissibility." *Dickerson*, 2018 WL 5851444, at *8.

Although Burgdorf's testimony was enough to provide the authentication for State's Exhibit 32 required by K.S.A. 60-464, we agree with Richard's argument on appeal that without producing the records custodian's affidavit at trial, the State failed to satisfy the business records exception to the hearsay rule under K.S.A. 2018 Supp. 60-460(m). Richard cites this court's analysis in *State v. Holloway*, No. 120,290, 2020 WL 4250262 (Kan. App. 2020) (unpublished opinion), to support his claim. In that case, this court considered whether the district court erred in admitting a "FD-302 Form Report" from the Federal Bureau of Investigation (FBI). The State did not produce an affidavit from a records custodian nor did anyone from the FBI testify to the foundation of the report.

The *Holloway* court found the State failed to lay an adequate foundation for the report as a business record. It noted that the State's witness who obtained the report "failed to establish that he had knowledge of the methods and circumstances involved in the preparation of the FBI report. As a result, the detective's testimony did not show that the methods and circumstances utilized by the FBI in preparation of State's Exhibit 16 indicated it was trustworthy." 2020 WL 4250262, at *6. The court thus found that the admission of the evidence was improper. 2020 WL 4250262, at *7.

The State now argues on appeal that State's Exhibit 32 was admissible under the party admission exception to the hearsay rule. See K.S.A. 2018 Supp. 60-460(g) (defining exception to hearsay rule for party admissions when made in the person's

individual capacity). We agree with the State that K.S.A. 2018 Supp. 60-460(g) would apply here to allow the admission of State's Exhibit 32. Applying this hearsay exception along with Burgdorf's detailed testimony about the steps she took to ensure the accuracy of the information from Facebook, the State laid a sufficient foundation to show that Exhibit 32 was what the State purported it to be—Richard's Facebook conversation.

The State did not rely on the party admission exception to the hearsay rule at trial. For this reason, we could decline to consider the State's argument for the first time on appeal. See *State v. Warledo*, 286 Kan. 927, 938, 190 P.3d 937 (2008) (because State's argument that testimony was admissible under the excited utterance exception was being raised for the first time on appeal, the court declined to address the issue). But we observe that Supreme Court Rule 6.02(a)(5) (2021 Kan. S. Ct. R. 35), that prevents new issues from being raised for the first time on appeal, only applies to the content of the appellant's brief. Supreme Court Rule 6.03 (2021 Kan. S. Ct. R. 36), addressing the content of the appellee's brief, contains no similar prohibition. And even if the rules of appellate procedure generally prohibited the appellee from raising new issues or making new arguments on appeal, a recognized exception to this prohibition allows a party to assert a new legal theory for the first time on appeal if it establishes the district court's ruling was right for the wrong reason. *State v. Johnson*, 309 Kan. 992, 995, 441 P.3d 1036 (2019).

Without reaching a final decision on whether the district court erred in admitting State's Exhibit 32, we find that any error in the admission of the exhibit was harmless. Richard did not admit to shooting Swygert in his Facebook messages. The Facebook messages were not a central part of the State's case against Richard, and in fact, the prosecutor never mentioned the Facebook messages in his closing argument. The probative value of the exhibit was to place Richard at the scene of the shooting. But there was a great deal of other evidence placing Richard at the scene of the shooting including Real's testimony that Richard and Swygert were arguing at the Burger King a brief time

23

before the shooting, the Burger King surveillance video showing the altercation between Richard and Swygert, and Richard's own statement to the police that he was following Swygert down the sidewalk when he heard a gun go off nearby. Swygert staggered into the Taco Bell about a minute or two after leaving the Burger King where she had argued with Richard. And, of course, Swygert's statements to the police and the customers at the Taco Bell identified Richard as the shooter. Thus, we find that any error in the admission of the Facebook messages did not affect the outcome of the trial and is not a ground for reversing Richard's convictions and granting him a new trial. See K.S.A. 2018 Supp. 60-261.

## DID THE DISTRICT COURT ERR IN ADMITTING THE BURGER KING SURVEILLANCE VIDEOS?

Richard next claims the district court erred in admitting State's Exhibit 31, the Burger King surveillance videos. These videos showed Richard and Swygert at the Burger King next to the Taco Bell right before the shooting, there was an altercation between the two, and Richard physically removed Swygert's hat from her head. The State introduced the exhibit through the testimony of Norma Garcia, the Burger King district manager over the Kansas City area. Real, the Burger King employee present when the incident occurred, also provided relevant testimony about the videos. Richard argues the State failed to lay a sufficient foundation to introduce the exhibit. Conversely, the State argues that it laid a proper foundation for the surveillance videos through its witnesses.

Richard objected to the introduction of the surveillance videos at trial based on insufficient foundation, so the issue is preserved for appellate review. We have already outlined our standard of review over questions about the admissibility of evidence in the previous issue. Along with those standards, the following legal principles—as recently outlined in *State v. Montgomery*, No. 120,992, 2020 WL 6533260, at *1 (Kan. App. 2020) (unpublished opinion)—also apply to this analysis:

24

"Videos, like photos, are 'writings' under Kansas evidence rules. See K.S.A. 2019 Supp. 60-401(m); *State v. Dale*, 293 Kan. 660, 662-63, 267 P.3d 743 (2011). The burden of establishing a foundation to admit a writing is 'minimal'—it requires only that the proponent offer evidence that a reasonable juror could rely on to conclude that the writing is what the proponent represents it to be. *Jenkins*, 311 Kan. at 51. The evidence may be circumstantial or indirect. 311 Kan. at 51. 'Photographs are generally admissible after proper foundation and identification if they accurately represent an object that is material and relevant to an issue in the case.' *State v. Kemp*, 30 Kan. App. 2d 657, 662, 46 P.3d 31 (2002). The degree of accuracy required varies depending on the purpose of the photograph. *State v. Suing*, 210 Kan. 363, 365, 502 P.2d 718 (1972). The person who lays the foundation for a photograph need not be the person who took the photograph. *State v. Pruitt*, 42 Kan. App. 2d 166, 176, 211 P.3d 166 (2009). No statute or case requires the witness to be the person who downloaded the video from the cameras or burned it onto the DVD. *State v. Miles*, No. 110,511, 2014 WL 7565767, at *7 (Kan. App. 2014) (unpublished opinion). And those testifying do not have to state specifically that the pictures are 'fair representations' of what was portrayed. *Suing*, 210 Kan. at 365."

Our Supreme Court also recently provided the following guidance for considering foundation for recordings in *Jenkins*, 311 Kan. at 48:

"'Perhaps the best way to establish a minimal sufficient foundation is through testimony as to the recording's accuracy by a nonparticipant who overheard the conversation as it occurred, either through physical presence or electronic monitoring. Other methods that courts have found to satisfy minimal sufficient foundation requirements include a participant's testimony that the recording is accurate, an independent determination by the trial judge that the recording is accurate, evidence as to chain of custody, or testimony of a participant in the conversation together with proof by an expert witness.' 23 Am. Jur. 3d Proof of Facts 315 § 35, pp. 401-02."

The record reflects that the State provided sufficient authentication and foundation for the Burger King videos through the testimony of two witnesses. Garcia testified that she downloaded the surveillance videos and provided them to the police. She explained

that she does not maintain the videos personally, but Burger King maintained the DVR surveillance system and the cameras ran continually while the restaurant was open. She also stated that the videos were kept in the ordinary course of business. And she was the only person with access to the videos, but she cannot—and did not—alter or delete any footage. Garcia also testified that the videos depicted the Burger King on December 22, 2018. The videos are also timestamped. Garcia's testimony thus sufficiently "negates any serious inference that the tape had been subjected to tampering." *Montgomery*, 2020 WL 6533260, at *2 (citing *State v. Pham*, 281 Kan. 1227, 1243-45, 136 P.3d 919 [2006]).

Richard contends, however, that Garcia did not work the night of the shooting and, thus, did not have the requisite personal knowledge to say what was on the surveillance tape. But as this court has noted the "virtue of surveillance cameras" is that they run unattended. *State v. Moon*, No. 119,423, 2019 WL 2479458, at *4 (Kan. App. 2019) (unpublished opinion). And our appellate courts have long recognized that the person who lays the foundation for a photograph need not be the same person who took it. *State v. Pruitt*, 42 Kan. App. 2d 166, 176, 211 P.3d 166 (2009). Garcia provided the necessary foundation to establish that the videos were authentic. And Richard ignores that the State called another witness who provided relevant testimony about the videos—Real.

Real was working on the day of the shooting. She provided testimony establishing what the videos purportedly showed based on her personal account of the events. Real's testimony described Richard and Swygert's actions both inside and outside the building, including when they were fighting outside. She also specifically recognized and identified Richard as the man in the video. Real testified after Garcia and, significantly, the videos were not published to the jury until Real's testimony. Thus, the testimony of the two witnesses together provided enough evidence to meet the "'minimal'" burden to admit relevant and material videos. *Jenkins*, 311 Kan. at 51. The district court did not err in admitting the Burger King surveillance videos.

## DID THE DISTRICT COURT COMMIT CLEAR ERROR BY NOT INSTRUCTING THE JURY ON IMPERFECT SELF-DEFENSE VOLUNTARY MANSLAUGHTER?

Richard next claims that although he did not request the instruction at trial, the district court committed clear error by failing to instruct the jury on imperfect defense, a form of voluntary manslaughter. The State argues that Richard not only failed to request the instruction but invited the error and is thus precluded from challenging the jury's verdict on this basis. The State also argues that the instruction on voluntary manslaughter was not factually appropriate, and even if it were, the State contends the district court did not commit clear error by failing to give the instruction.

Voluntary manslaughter includes knowingly killing a human being committed upon an unreasonable but honest belief that circumstances existed that justified use of deadly force. K.S.A. 2018 Supp. 21-5404(a)(2). This form of voluntary manslaughter is commonly known as imperfect self-defense voluntary manslaughter. Richard now claims on appeal that the district court should have instructed the jury on this crime as a lesser offense of intentional second-degree murder.

"When analyzing jury instruction issues, we follow a three-step process: '(1) determining whether the appellate court can or should review the issue, *i.e.*, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, *i.e.*, whether the error can be deemed harmless.' [Citation omitted.]" *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018).

When, as here, a party fails to preserve an issue by requesting the instruction in the district court, an appellate court will still review whether the instruction would have been legally and factually appropriate but will reverse only if the party seeking reversal establishes "'clear error.'" *State v. Barber*, 302 Kan. 367, 377, 353 P.3d 1108 (2015); see *State v. Williams*, 295 Kan. 506, 516, 286 P.3d 195 (2012) (explaining that the burden to

show clear error is on the party seeking reversal). An instruction is clearly erroneous when "'the reviewing court is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred.'" *Barber*, 302 Kan. at 377.

Although this court may consider an unpreserved instruction claim for clear error, a defendant may not invite and lead a district court into error and then complain of the error on appeal. *State v. Verser*, 299 Kan. 776, 784, 326 P.3d 1046 (2014). Relevant here, a defendant cannot complain about the lack of an instruction when the defendant invited and led the trial court to error by requesting that court not give a lesser included offense instruction. *State v. Jones*, 295 Kan. 804, 812-13, 286 P.3d 562 (2012).

The State argues that Richard not only failed to request an instruction on voluntary manslaughter, but he invited any error and is thus precluded from challenging the jury's verdict on this basis. During the instruction conference, the district court noted that defense counsel did not offer any instructions for a lesser included offense for second-degree murder and asked whether counsel agreed that the facts did not allow an instruction on *involuntary* manslaughter. Defense counsel agreed that an instruction on involuntary manslaughter should not be given and added: "I simply cannot fathom what sort of lesser included [instruction] I could request for murder in the second degree." Defense counsel also stated that "my client is not making a claim of self-defense."

Defense counsel stated that he could not think of any lesser offense to second-degree murder that applied here, and he rejected any claim of self-defense. Still, defense counsel never expressly rejected an instruction on imperfect self-defense voluntary manslaughter. Although the issue is close, we decline the State's request to apply the invited error doctrine in this situation.

Voluntary manslaughter under K.S.A. 2018 Supp. 21-5404 is a lesser included offense of intentional second-degree murder under K.S.A. 2018 Supp. 21-5403(a)(1).

28

See, e.g., *State v. Gallegos*, 286 Kan. 869, 874, 190 P.3d 226 (2008). Thus, an instruction on imperfect self-defense voluntary manslaughter would have been legally appropriate.

We next consider whether the instruction would have been factually appropriate. When evaluating whether a lesser included instruction is factually appropriate, courts use the following test: "Is there some evidence when viewed in the light most favorable to the defendant that would allow a rational factfinder to find the defendant guilty of the lesser included offense?" *McLinn*, 307 Kan. at 324-25.

Richard did not testify at trial. The only evidence that would have supported an instruction on imperfect self-defense voluntary manslaughter was Richard's Facebook messages. In these messages dated the day after Swygert's death, Richard explained that he would never hurt anyone unless his life was in danger and he mentioned that a lady had chased him, tried to stab him, and pushed him into moving cars. Although this evidence was somewhat vague, it provides some support for a potential claim by Richard that he killed Swygert based upon an unreasonable but honest belief that circumstances existed that justified use of deadly force. See K.S.A. 2018 Supp. 21-5404(a)(2). Although it is a close call, this evidence provides some factual basis for a lesser offense instruction on imperfect self-defense voluntary manslaughter.

But even if an instruction on imperfect self-defense voluntary manslaughter was both legally and factually appropriate, Richard fails to firmly convince this court that the jury would have reached a different verdict had the instruction been given. See *Barber*, 302 Kan. at 377. Richard did not testify at trial or offer any evidence to try to justify the shooting. Any suggestion that Swygert was ever chasing Richard, trying to stab him, or trying to push him into moving cars after she left the Burger King for the final time conflicts with Richard's own statement to the police. And as part of his defense, Richard argued to the jury that he was significantly taller than Swygert—he was 6 feet 3 inches tall while Swygert was 5 foot, 8 inches. Swygert's autopsy report showed she only

29

weighed 104 pounds. Based on the weak evidence that would have supported a jury instruction on imperfect self-defense voluntary manslaughter, we conclude the district court did not commit clear error by not instructing the jury on this lesser offense.

WAS RICHARD DENIED A FAIR TRIAL BASED ON CUMULATIVE ERROR?

As a final challenge to his convictions, Richard asserts that cumulative error denied him a fair trial. When evaluating a claim of cumulative error, this court considers the totality of the circumstances to determine whether the errors substantially prejudiced the defendant and denied the defendant a fair trial. In making this determination, "an appellate court examines the errors in context, considers how the district court judge addressed the errors, reviews the nature and number of errors and whether they are connected, and weighs the strength of the evidence." *State v. Thomas*, 311 Kan. 905, 914, 468 P.3d 323 (2020) (citing *State v. Holt*, 300 Kan. 985, 1007-08, 336 P.3d 312 [2014]).

We have not conclusively identified any error committed at Richard's trial. The only *potential* errors we have discussed were the admission of the Facebook messages under the business records exception to the hearsay rule and the district court's failure to sua sponte instruct the jury on imperfect self-defense voluntary manslaughter as a lesser offense to intentional second-degree murder. Interestingly, had the district court excluded the Facebook messages, there would have been no factual basis for the voluntary manslaughter instruction. In any event, for the same reasons we did not find either of these potential errors to require reversal of Richard's convictions, we also find that the cumulative effect of the possible errors did not deny Richard a fair trial. A criminal defendant has a right to receive a fair trial but not a perfect one. *State v. Walker*, 308 Kan. 409, 426, 421 P.3d 700 (2018). Richard received a fair trial, and we have no reason to overturn his convictions based on the arguments he makes on appeal.

DID THE DISTRICT COURT ERR IN ONLY PARTIALLY GRANTING RICHARD'S MOTION FOR A DEPARTURE SENTENCE?

Before sentencing, Richard moved for a durational departure from the sentencing guidelines for his second-degree murder conviction, requesting a sentence applicable to an offender with a criminal history score of C instead of B. He later specifically requested a sentence of 272 months' imprisonment. The district court granted Richard's motion but only partially, splitting the difference between the presumptive term for the homicide of 586 months and Richard's request for 272 months and sentenced Richard to 429 months' imprisonment. Richard appeals the sentence, arguing that the district court erred in only partially granting his request for a departure sentence. The State argues that assuming the district court had any legal ground to grant a departure, it did not abuse its discretion by imposing a sentence of 429 months' imprisonment.

Under K.S.A. 2018 Supp. 21-6820(a), a departure sentence is subject to appeal by the defendant or the State. See *State v. Looney*, 299 Kan. 903, 907-08, 327 P.2d 425 (2014) (holding a partial departure sentence is subject to appeal). Both parties agree that when the question is whether the district court erred in the extent of a durational departure, appellate courts review for abuse of discretion. *State v. Saucedo*, 310 Kan. 361, 366, 446 P.3d 491 (2019). A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *Ingham*, 308 Kan. at 1469. The party asserting the district court abused its discretion bears the burden of showing such abuse of discretion. *State v. Thomas*, 307 Kan. 733, 739, 415 P.3d 430 (2018).

The district court found that the age of Richard's criminal history, the lack of similar offenses in his criminal history, and the disproportionate difference in the term of the presumptive sentence for an offender with a criminal history score of C versus B provided substantial and compelling reasons to depart from the presumptive sentence for

the homicide. On appeal, Richard argues that the district court erroneously failed to consider other factors such as his claim that evidence showed that Swygert was the aggressor in the criminal conduct associated with the crime of conviction. See K.S.A. 2018 Supp. 21-6815(c)(1)(A). But this court is limited to considering only the articulated reasons for departure stated on the record at sentencing. *State v. Scuderi*, No. 107,114, 2013 WL 3791614, at *8 (Kan. App. 2013) (unpublished opinion) (citing *State v. Spencer*, 291 Kan. 796, 811, 248 P.3d 256 [2011]).

Based on our review of the record and given the reasons articulated by the district court for granting a departure, a reasonable person could agree with the district court's decision to split the difference between the sentencing terms the parties were requesting and to sentence Richard to 429 months' imprisonment for his conviction of intentional second-degree murder. Richard fails to meet his burden of showing that the district court erred in only partially granting his request for a departure sentence.

DID THE DISTRICT COURT ERR IN GRANTING ANY DEPARTURE SENTENCE?

In a cross-appeal, the State contends the district court erred by granting any departure sentence because there were no substantial and compelling reasons to grant a departure. Conversely, Richard argues there were substantial and compelling reasons to support the durational departure granted by the district court.

A sentencing judge must impose the presumptive sentence in the applicable sentencing guidelines grid "unless the judge finds substantial and compelling reasons to impose a departure sentence. If the sentencing judge departs from the presumptive sentence, the judge shall state on the record at the time of sentencing the substantial and compelling reasons for the departure." K.S.A. 2018 Supp. 21-6815(a).

32

In any appeal of a judgment of conviction imposing a sentence that departs from the presumptive sentence prescribed by the sentencing grid for a crime, the review of the sentence will be limited to whether the sentencing court's findings of fact and reasons justifying a departure are (1) supported by the evidence in the record and (2) constitute substantial and compelling reasons for departure. K.S.A. 2018 Supp. 21-6820(d). When the question is whether the record factually supports the articulated reasons for a departure, an appellate court reviews for substantial competent evidence. *State v. Brown*, 305 Kan. 674, 693, 387 P.3d 835 (2017). When the question is whether factually supported reasons constitute substantial and compelling reasons for departure, an appellate court has unlimited review. 305 Kan. at 693-94.

K.S.A. 2018 Supp. 21-6815(c)(1) provides a nonexclusive list of mitigating factors that may be considered by a district court in deciding whether there are substantial and compelling reasons to depart. Our Supreme Court recently clarified the standard for reviewing a departure sentence based on a factor not included in the statute:

> "When an appellate court is considering whether a sentencing court erred in granting or denying departure based on a nonstatutory factor, the reviewing court applies an abuse of discretion standard. This means appellate review of the departure decision should follow a three-step framework: (1) determine whether the sentencing court's nonstatutory factor can be a mitigating factor as a matter of law under K.S.A. 2019 Supp. 21-6815(c); (2) if it can, then decide whether that nonstatutory factor's existence is supported by the record; and (3) if so, then determine whether the sentencing court acted reasonably when it concluded there was a substantial and compelling reason to depart in a particular case based on that nonstatutory factor by itself or collectively with other statutory or nonstatutory factors cited by the sentencing court.
>
> "Viewed in this way, it remains clear the applicable standard of review is abuse of discretion by matching what is at issue with the traditional abuse of discretion analytical progression. For example, a sentencing court could abuse its discretion at the first step if its ruling was based on an error of law; at the second step, its discretion could be abused if its finding was based on an error of fact; and at the third step its discretion

could be abused if its ruling was unreasonable. See [*State v.*] *Jolly*, 301 Kan. [313, 325, 342 P.3d 935 (2015)]. Put differently, the respective inquiries on each analytical step are: (1) whether the determination of a nonstatutory factor was guided by an erroneous legal conclusion; (2) whether substantial competent evidence supported the factual finding that the factor existed, i.e., an error of fact; and (3) whether a reasonable person would have taken the view adopted by the sentencing court. And it is important to emphasize that only the first step involves a legal question, subject to unlimited review." *State v. Morley*, 312 Kan. 702, 711, 479 P.3d 928 (2021).

As stated above, the district court found that the age of Richard's criminal history, the lack of similar offenses in his criminal history, and the disproportionate difference in the term of the presumptive sentence for an offender with a criminal history of C versus B provided substantial and compelling reasons to depart from the presumptive sentence for the homicide. All three reasons are nonstatutory factors for supporting a departure. See K.S.A. 2018 Supp. 21-6815(c)(1). We will address these reasons in reverse order.

First, the district court correctly observed there is a substantial difference in the term of the presumptive sentence for an offender with a criminal history of C versus B. In Richard's case his presumptive sentence for the second-degree murder conviction with a criminal history score of B was 586 months' imprisonment. The presumptive sentence for the same crime of conviction under criminal history category C would have been 272 months' imprisonment. But we reject the district court's conclusion that this fact constitutes a substantial and compelling reason to grant a departure. Essentially, the district court substituted its judgment for that of the Legislature and rejected the sentencing grid provided by law at K.S.A. 2018 Supp. 21-6804.

Second, the district court found that the lack of similar offenses in Richard's criminal history was a substantial and compelling reason to depart. While this factor might support a departure in some cases, we disagree that it supported a substantial and compelling reason for a departure in Richard's case. Richard's PSI report revealed 19

34

prior adult convictions including convictions of robbery and conspiracy to commit robbery. We find the fact that Richard had no prior convictions of second-degree murder hardly amounts to a substantial and compelling reason to grant a departure sentence.

The district court's third reason for granting a departure was the age of Richard's criminal history. As the State points out, "'a defendant's criminal history cannot be used as justification for a departure sentence when the sentencing guidelines have already taken the defendant's criminal history into account in determining the presumptive sentence within the grid.'" *State v. Theurer*, 50 Kan. App. 2d 1203, 1227, 337 P.3d 725 (2014). But Kansas courts have long recognized that the age of a prior conviction may be a compelling reason to depart. *State v. Heath*, 21 Kan. App. 2d 410, 415, 901 P.2d 29 (1995). Richard's two prior person felony convictions for robbery and conspiracy to commit robbery were committed in 2003. These were the two convictions that gave Richard a criminal history score of B. That these two convictions occurred 15 years before Richard's current crime of conviction can be properly considered by the district court as a substantial and compelling reason to grant a departure sentence.

Thus, the district court's departure sentence in Richard's case was based on at least one reason that was supported by the evidence in the record and constituted a substantial and compelling reason for departure. See K.S.A. 2018 Supp. 21-6820(d). In Kansas, there is no legal requirement that all the reasons given by the district court to support a departure sentence be substantial and compelling provided at least one factor the district court relied on is substantial and compelling. *State v. Sampsel*, 268 Kan. 264, 282, 997 P.2d 664 (2000). Based on the record here, we conclude the district court did not err in granting Richard's motion for a departure sentence.

Affirmed.